Case No. 3-16-0554 Carpentry by Connor Construction, Inc. v. Trinity Construction, LLC Appellees by Scott Foster v. Estate of Richard Demith Joette Revelli as Executive of the Estate, Appellant by Mark Lukanich Mark Lukanich on behalf of the Estate of Richard Demith and Joette Revelli as the Executive of the Estate. May it please the Court. The Court is aware that in 2012 a home owned by the Estate burned. The following year, in 2013, Joette Revelli as the Executive of the Estate entered into a contract with Anacom to demolish what remained of the structure and to construct a new home. The price agreed to by Anacom to demolish and construct the new home was $414,000. The uncontroverted evidence in this case submitted in opposition to the motion for summary judgment, both by Connor and E. Trinity, was that the Estate has already paid $442,700 for the completion of the home. That doesn't include the approximately $102,000 in name claims that have been asserted by Connor and E. Trinity. If those names are deemed enforceable, the Estate will be required to pay approximately $544,270 for the construction of the home it contracted to have built for $414,000. And that's excluding the interest that is accruing on the mechanic's name. It's situations like this that Section 21A of the Mechanics' Main Act was enacted to prevent it. Let me, before you go any further, let me ask you to hear that nobody really talks much about. But on April 21st, I believe it was, April 21st of 2016, you took a money judgment against Anacom for $144,000.  And that was by backing the $414,000 or something out of $558,000 or something like that? Yes. That money judgment included these lien claim amounts, right? It did. And so how can you take a money judgment against somebody else for that lien amount and then come in and say you don't owe the liens? The money judgment was never collected. It was never what? Not collected. It doesn't matter if it's collected. That's a matter of collection. It was entered. You took the judgment. You reduced the judgment to a money judgment. With all due respect to the court, the lien claims also obtained judgments against. Well, just so you know, we kind of talked about this and this came up because nobody talks about it much. So when you all are done here today, we'll figure out a schedule and would like this issue briefed as to the effect of that money judgment entered against Anacom on your ability to contest these liens. Because these are your words out of the thing. Ms. LaMalle spent a total of $558,834.20. I'll say it again, $558,834.20 to complete the work that Anacom had agreed to, $414,000. And then you had the default entered before, but you proved it up on April 21st and an order was entered reducing that to a money judgment. And so, just so you know, what I want to hear from you all is in light of that money judgment you've entered against Anacom, which we've done the math, clearly includes Conard's lien and E. Trinity's lien. Can you now come back and contest those liens? I believe, yes, sir. And so I'm going to give you a fair chance to – let me ask you this, would 14 days be enough? If we had a 21, yes. All right, 21 and 14 for you? Is that fine? That would be fine. And then we'll have another seven after that. Fair? It's fair, Judge. Okay, we'll issue that as a formal minute order so that you'll have those dates and everything. But the minute order will be whether you get it today or not. I can make it effective 21 days today. Is 14 enough or do you want 21 too? Justice, if you could give me 21, I'd love that. All right. Thank you, sir. I want 21 and 7, all right? That's fine, Your Honor. All right. Okay, I'm sorry, go ahead. That's fine, Judge. That issue aside, and I don't believe that issue is controlling, but we'll address that later. Given the facts before the court, the law, Section 21 provides that in no case shall an order be compelled to pay more than the original contract price unless the owner made payments to the contractor in violation of the mechanics act. And I believe, Judge, I'm going to be relying on this in response to your question as to whether or not the money judgment is going to prevent us from challenging the lien claims. But anyway, that's for later on. So if the estate made no payments in violation to the rights, any of the rights of Connor on the mechanics, it can't be compelled to pay more than its contract price for that. That's the issue. With respect to Connor's lien claim, did the estate make any payments to an account in violation of Connor's rights under the act? Why does that matter? He complied with the registration of lien, recording of lien requirements, and there's no dispute that he did the work. No, there's not. So I don't understand why that matters. Well, it matters, Judge, because Section 21D says that even in the case law, interpreting Section 21D states that even if a subcontractor complies with the mechanics of the act and perfects its lien, the owner still cannot be compelled to pay more than the contract price. It's an unfortunate situation, but we have two innocent parties, in essence, because if the owner has not made any payments in violation of the rights of the subcontractor, it is an innocent party. And when you have a subcontractor that complies with the terms of the mechanics of the act, one of those two innocent parties is going to have to suffer. And the case law is fairly clear that in those situations, the owner or the subcontractor is the one that bears the loss, for lack of a better word. And I think that's found in the contractor's regimen versus relative in construction case. And I'll quote very briefly. For both an owner and a subcontractor supplier, where the general contractor has both followed statutory requirements, the owner is protected against the lien for amounts unpaid by the contractor to the subcontractor or supplier. It's very clear. And that's our position here is that we have two innocent parties. Now, I will concede. I'm sorry. Did you have a question? But you didn't, your client didn't comply with the statutory requirements. But Section 121D doesn't say comply with the statutory requirements. Section 21D says as long as no payments were made in violation of the rights of the subcontractor. Different words. So you have to analyze this case under those words. Were any payments made by the owner of the estate in violation of counterfeits? And the timing of those payments becomes very important in this case. Because you know that from the affidavits and the evidence that the last payment made by the estate to Anaconda was September 10th, 2013. So all $70,000, $70,280 was paid prior to September 10th. Connor wasn't a subcontractor at that time. Connor did not become a subcontractor until September 21st of 2013. More than days later. So given that, given that this court has to construe the requirements of the Mechanics Lien Act strictly in determining whether or not the requirements for Mechanics Lien have been met, you have to determine what rights did Connor have under the Mechanics Lien Act at the time the estate made the payments to Anaconda. And because the Mechanics Lien Act only confers rights and benefits upon contractors and subcontractors, because Connor was not a subcontractor at the time the last payment was made, it had no rights under the Mechanics Lien Act that were violated by those payments. But that's assuming that the only source of payment for him could be from that $70,000 that was the earlier payments that were made. You're discounting the money judgment that you got. Well, that was well after judgment. That really has nothing to do with whether or not the payments made by the owner of the estate were in violation of Connor's rights. That's the issue. The money judgment came far later after default by Anaconda. But I submit to the court that that is the issue here. Because if there were no payments by the estate in violation of Connor's rights, then Section 21D applies, and it insulates the owner, the estate, from having to pay more for the construction of its residence, the house, than the contractor in the $414,000. I submit this issue was decided 100 years ago in the Berkshire case by the Supreme Court. And in that case, the Supreme Court held very succinctly that payments to a contractor in the absence of a sworn statement were not made in violation of the rights of the subcontractor where the payments were made prior to the date of the subcontractor's subcontract. The Supreme Court went on even further and said even after the subcontractor entered into a subcontract with the contractor, where the owner made payments to the contractor without requiring a sworn statement, where no sums were due to the subcontractor at the time of those payments, those payments were not made in violation of the rights of the subcontractor. And there's really no distinguishing Berkshire from the situation that we have here. All payments were made prior to Connor's subcontractor, and therefore Connor wasn't prejudiced by those payments. They weren't made in violation of his rights because he had no rights as a contractor. Even if a sworn statement had been required by the estate prior to making the payments, Connor wouldn't have been on it because he wasn't a subcontractor. Let me ask you, all right, I understand that, but so you fire that general. Yes, sir. And you hire a new general with notice of the prior sub and with notice that he hadn't been paid. And so, and then you sign a new contract with somebody else. So do you think the intention of the Act is to allow you to stiff those subcontractors by just firing the general and hiring a new one? No, no, I do not. But the issue is what was owed Anaconda at the time Connor served notice of his lien? Because the contract between the estate and Peat Construction, which was a subcontractor, really had no bearing on Connor. That was between LaValle or the estate and Peat. Connor's right to lien only attached to the money that was due Anaconda from the estate. Now the fact, because the way that it played out was prejudice to Connor, it really wasn't the estate's fault. They had a contractor that they entered into a contract with that breached that contract. At the time Connor served notice of a lien, Anaconda was not owed any money because they were breaching that contract. Or that's an issue of fact that was. Whether or not Anaconda was owed any money at the time Connor served his notice of a lien. Because that's the only funds that Connor's lien could attach to. It could attach to Peat, but it wasn't in privity with Peat. The lien attaches to the property. To the property, right. The real estate, not to the general. But it attaches to the property through the contract with the contractor. And then through the contractor's contract with the owner. So, if that's correct, then somebody can hire a general, bring in a bunch of subcontractors, fire the general, don't owe the general anything, hire a new general, and not have any duty to these subcontractors, which he had noticed, and had lien notice. Do you think that's in the act? No, sir, but I don't think that situation where an owner obtains a subcontractor, has work done, has subcontractors on the job, and fires a subcontractor is analogous to the situation we have here. Here, the subcontractor, I'm sorry, the contractor breached the contract. In the situation propounded by Your Honor, the owner would owe the contractor money. But let's say he fired the contractor with cause, with notice, that subcontractor had hired generals. Let's say he hadn't made any payments. It doesn't matter. So, he hasn't made any payments in derogation of the rights of these subs. And then he goes out and hires a new general because he's fired the old general. And then these subcontractors have no lien rights against the first general who got the subs of the first general who did work, came in there, supplied materials, did work, and the owners got notice of all that, fires the general, then hires a new one, and these guys are yesterday's news and you don't have to worry about those liens? Again, Your Honor, it's not that you don't have to worry about the liens. The answer to your question is dependent on what was owed to the general contractor. I mean, the Briggs case says that. I mean, the case law is very clear that the subcontractor's lien rights are dependent upon the owner's contract with the contractor. And if the owner dismisses the contractor without cause, but still owes the contractor money, the subcontractor's lien rights are good and they're in full force in effect. But in situations where the owner is not obligated, it doesn't owe the contractor anything, then unfortunately for the subcontractors, no, their lien rights, I don't believe their lien rights can attach to sums that aren't owed from the owner to the general. Two minutes, please, counsel. Our position with respect to the counter's rights to lien are, I think, fairly more covered in the brief, and because of the lack of time, I will move on to very briefly to address the E. Trinidad's claim. E. Trinidad is a completely different claim, and the basis for the appeal is completely different than that in relation to counter. E. Trinidad, no doubt, did work on the project and when I contested it, they were a mechanics lien claimant, but the question with E. Trinidad is whether or not E. Trinidad complied with the requirements of mechanics lien, which affect its lien. One of the requirements, as this court is well aware, is that a subcontractor, in the absence of a sworn statement, which lists a contractor, must serve the owner with notice within 90 days from the last day of work in order to perfect its lien. That is a condition preceding to the creation of the lien and to a suit to enforce the lien. The law is very clear on that. The law is also very clear that the owner must receive actual notice. Yes, numerous cases, a whole lot. In this case, we know from the evidence that the home burned to the ground and it was under construction in December of 2013. E. Trinidad, through Mr. Rabick, I think his name is, or Herrick, attempted to serve the Section 24 notice by simply sending it to a building that it knew it should have known was uninhabited by the owner. There's no case cited that even infers that a subcontractor's obligation to serve the owner with notice under Section 24 can be satisfied by simply sending the notice to the address of the work. The cases require that the subcontractor exercise reasonable diligence in locating the owner in order to serve that owner with the Section 24 notice. Let me just ask you, E. Trinidad was the concrete sub, right? Yes, sir. For the foundation? Yes, sir. Do you have to have this type, does actual notice count for anything? Actual, I'm sorry. Does actual notice, in other words, if you know about it, does actual notice under the act count? No, it does not. I submit to the court that even if the owner is aware that a subcontractor is on the job, it doesn't satisfy the notice requirement of Section 24. And there are spare cases I believe I cited. So unless there are any more questions, thank you. Thank you. Mr. Hoster. Thank you very much. Mr. Lupich, please report to this honorable panel. My name is Scott Hoster. I'm from Joliet, and I represent E. Trinity, who did the excavating work, and I represent Connor Construction, who did the carpentry work on this house. I'll go backwards, if I may, just to address Mr. Lupich's point on E. Trinity, the lien. Bill Horaybeck from the Goldstein-Skrodsky firm in Burr Ridge filed a lien on behalf of E. Trinity. Where did he get the address for Ms. Lavallee, who was the executor of the estate? He went to the probate file and found her address. In the probate file before Judge J. Jeff Allen in the Circuit Court of Will County, she was appointed executor. She had herself appointed executor. Her address is the address of this house. The house had burned down and was being rebuilt. She never changed her address in the probate file. So how did anybody know where she went? She submitted an affidavit in the case that said, well, I wasn't living there at the time. Well, that's kind of interesting. If you were the executor of the estate and you moved, maybe you ought to file a change of address in the probate case and tell everybody where you are. If they want to serve claims on you or things of that nature. So Mr. Horaybeck did everything right. He served her by certified mail at the only address he knew, where she was listed as executor in the probate file. The letter went out certified. It was attempted delivery two or three times. It came back unclaimed, and the post office put on it no forwarding address. So he did everything he could do under Section 24 to attempt to notify her. Mr. Lukanich has talked about, and I think I'll go backwards from that, because you folks have raised a lot of the points, but there was a Berkshire case that the Illinois Supreme Court decided in 1915. I would point out to the court, I think I dealt with it in my brief pretty thoroughly. In Berkshire, there had been three contractors, Section 5 sworn statements given to the owner. And the sub in that case, after the owner had paid everything out pursuant to the three separate Section 5 statements, the owner tried to file a lien for $845, which probably was a significant sum of money in 1913 or 14 or 15. I agree. But the court in 1915 decided you can't go ahead and do that because it's over. Everything's paid. Everybody's reliant on their sworn statements. The case that Mr. Lukanich hasn't talked about is a case that came from our little courthouse in Joliet, came here, and then it went to the Illinois Supreme Court. Weathertight. In 2009, the Illinois Supreme Court spoke about how mechanics things are supposed to work. What happened, and I know the case well, it did happen in our court and in our town, College of St. Francis, which is now St. Francis University, hired Ron Stonich Construction to do a big addition for the College of St. Francis. Mr. Stonich was kind of one of Joliet's high flyers at that point in time and was building a lot of things, a lot of money flowing and such. And so the owner, St. Francis, did get a Section 5 affidavit from Stonich. It had all the subs listed. It may not have had all their names because toward the end of a construction project that goes six, seven, eight months, a lot of the time the general doesn't know who he's going to use for some work at the end. He's going to take bids out. He's going to say, I've got a $50,000 allowance for carpeting or flooring for this or that. But a lot of the time, all the subs, their names are not on the sworn statement, but it will say, you know, tile supplier or whatever, carpet supplier. So Stonich gives St. Francis the sworn statement, and the College of St. Francis makes one mistake. They rely on the sworn statement. They pay Ron Stonich, only they make a check for $200,000, $300,000 payable to Ron Stonich. Ron puts it in his account at First Midwest Bank. What everybody didn't know was that Ron, at that point in time in 2007, was starting to get a little shaky, and he owed First Midwest Bank some money. They exercised their right, they had a line of credit with Stonich, and when Ron put the $300,000 or whatever it was in his checking account at First Midwest Bank, First Midwest slept it and said, we're applying our right of set-off, and we're taking the money, we're calling the line of credit, we think you're insecure, and they took the money. So Doug Schlack's client, Weathertight, comes along and said, you guys didn't pay me for the windows. I put all these windows into these new buildings. And Judge Petrangalo had to make the decision, okay, is St. Francis going to have to pay twice, or is Weathertight going to take it on the chin and not get paid? Ultimately, the Illinois Supreme Court said, St. Francis, you've got to pay twice. Even though you got the Section 5 sworn statement, that sworn statement gives you a list of all the subs that are going to do work on this job. And it may have said Weathertight, or it may have just said window contractor, but there's a line there that says window contractor $50,000, $60,000. You have noticed that you've got to protect that sub and pay for their work. And you can't just give a check to the general contractor, Ron Stonich. And so St. Francis lost in Weathertight. The Illinois Supreme Court saying it is the duty of every owner to get a Section 5 affidavit. Even if you do, and you make a lump sum payment to the general, you've got to notice because of that Section 5 affidavit that these subs are doing work. You've got to hold money aside for the subs and get waivers from the subs. So salary owner, you have to pay twice. And that's kind of the tension between a sub that did everything right, which Weathertight did, and an owner who thought they did everything right. Their only mistake was paying Stonich in a lump sum check. He put it in first Midwest Bank, and they took it. And then there was no money for Stonich to pay the subs. So now if I can just move to the facts of this case, and I'll cover this briefly. You folks have laid them out very well. This lady, the executor, Joette LaValle, pays Anacom $70,000 for a down payment on September 10, 2013. She doesn't get a Section 5 affidavit. Gets nothing. Just, here's your down payment. $70,000 check to the general, Anacom. Gets no sworn statement. Gets nothing. Anacom lets my people in. E-Trinity comes in and does all of the concrete work. Connor comes in and does $63,000, $500 worth of carpentry work. Does all the framing. All of that goes on. They complete their work in September and October after they're brought in. The owner knows what's going on. The owner knows exactly what's going on. She's watching the concrete be poured, watching the carpentry work go up. And my folks had both finished. And at October 28th, after my people had both finished, October 28th of 2013, she gets tired of Anacom for whatever reasons and she fires Anacom on October 28th of 2013. My folks have both done all the work and they're done. She's out of pocket. $70,000 that she's given to the general, she hasn't paid either of my two clients the subs a penny. Then she's unhappy with Anacom fires them. Randy sits on this for six months, knowing my clients served her with a lien in the fall and in December. We recorded our liens, do everything right in October, November, December of 2013. She sits on this six months after she fires Anacom and she signs a contract with a new contractor called Peak and it's dated April 29th of 2014. So six months after she gets rid of her general, with full notice that we're there, we're unpaid, our liens have been filed, perfected, she hires somebody else. I disagree with Mr. Lukinich. She can't then say, well, if I have to pay Peak Construction to do certain things, my limit's 414. We have no idea whether or not she made changes, whether she wanted Peak to add things. Maybe she took the six months that she was deciding what to do. Maybe she did all of that and maybe she built a bigger, better house. Maybe she made changes. We don't know and it's really not relevant because the only thing that Mr. Lukinich can say is she shouldn't have to pay more than the original contract price of 414 based on the original contract and the subs. And that's only if you get a Section 5 affidavit. Can I visit that issue? I didn't get very far in the statement of facts before I saw a huge red flag. This was an oral agreement? Well, yes. I was surprised about that, too, that this is an oral contract for 414,000. She gives a guy 70,000 down and doesn't get a single piece of paper. Does she even know what that oral agreement encompassed, what the project was going to look like? Justice, I don't. Mr. Lukinich would have to address that. As a matter of public policy, are we going to limit the amount to an oral contract? Because she could say the contract was for 200,000. Right, right. That's absolutely correct. And even if it is 414, she hasn't paid that out to the original contractor. She paid 70 to Anacom, and she hasn't paid Arlene. So, you know, she hasn't paid 414 under the original contract. And that's what the statute talks about. That is the cap for the subsequent liens. Yeah, and that assumes she gets a Section 5 affidavit from the general that has the 414 laid out. I mean, that's the thing. The case Mr. Lukinich wants to talk about, there is a case where an owner did get a Section 5 affidavit from a general contractor. And it shows on there that one of the subs was supposed to do $50,000 worth of work. And the owner relies on that, sets $50,000 aside for that sub. The sub comes in and says, I'm leaving it for $62,000 or something like that, which is $12,000 more. That case did say, no, the sub is limited to the $50,000 because it's shown on the sworn statement. The owner relied on it, you know, paid it out. That is the only time that an owner gets that type of protection. If they do everything right, getting a Section 5 affidavit, that's the only time. So this type of, you know, just complete sloppiness on behalf of an owner, there aren't any cases that reward an owner for doing that. And Weathertight, again, in 2009, the Illinois Supreme Court really rang out. They said, this is how a construction project ought to work. Boom, boom, boom, boom, boom. Section 5 affidavit, waivers, things of that nature. So I guess my summary, this is the data that you said. My people did everything right. They did the work. They haven't been paid a dime. They sent out a Section 24 notice, which they're supposed to do as a subcontractor. They filed their lien within four months, and they just haven't been paid a penny. And the owner is the one who was sloppy, gave $70,000 to Anacom, never got a Section 5 affidavit, and then sits on this six months and hires another general to finish the house, and then says, well, you know, I'm sorry, you subs, you need to go chase Anacom for your money. I gave them $70,000. That's not the purpose of the mechanics in that. So that would be my presentation. If anyone else has any questions, I'd be happy to. I have one just factual question. Yes. E. Conner. E. Trinity? I'm sorry. A lot of names. Conner originally said that they were owed $63,000, but the judgment in their favor was $78,000. Do you know how this is referenced? Judge Anderson awarded 10% mechanics on the interest. The statute allows 10% from the date of completion, and so our base lien was $63,500, and that was the date of completion was October 21st of 2013, and so that's about two, two and a half years of statutory 10% interest that Judge Anderson gave us. But E. Trinity didn't get that. I'm sorry. Conner did. I believe E. Trinity did also. We were in the low 30s with our base, and I should have brought the exact number in front of me, but he awarded 10% interest to both lien claimants from the date of completion. One of these amounts is wrong, because their original claim under their lien was $3,870, and that's what the summary judgment amount was, apparently. I don't know why that is. I would have to check that, but Judge Anderson did give both claimants 10% statutory interest. Okay. I thought we might have been at 33 or something with E. Trinity, and then the interest got it up to 38, but I'd have to go back and check this. I'm sorry. Okay, and I can check. Okay. We may have written something down wrong. Okay, yes. Thank you. Thank you all very much. Thank you. Mr. Lopez? Let me briefly respond. Addressing first the issue on the notice served by E. Trinity, counsel suggests that because of a pleading that was filed 20 months prior to the attempted service of the notice listed in the address of the estate as the address where the notice was sent, that absolved E. Trinity from any obligation to determine whether or not that still was the address where the owner resided for purposes of serving such a 24-month notice. I don't have the exact date of the fire at this time. It is in the record. I believe that the pleading that Mr. Hoster refers to was signed before the fire. After that, the home burned down. Again, E. Trinity was obligated to exercise reasonable diligence to determine where the owner resided and where it could be found for purpose of serving notice. Could they assume that your client used reasonable diligence in keeping the court informed of her address in a case that was pending in the circuit court of will of penalty? No. The owner doesn't have to exercise diligence in keeping the subcontractor's license. I'm not saying under the act, but I'm saying it was unreasonable for this person to assume that, hey, this person's involved in litigation in the will of penalty I know about. In a probate case, there's nothing else. And so I go to that probate file. Here's their address. Is that unreasonable to make that assumption? Well, not in this case, Judge, because you're the subcontractor. You were at the scene. You were the concrete supplier. You knew that the home was uninhabitable. So, no, not in this particular case. In general, Judge, I don't. Well, I'm saying in general speaking, people's house burned down. They're pretending it's uninhabitable. They've got to move. While it's being reconstructed, they often, and I would think virtually all of these would have their mail forwarded to wherever it is they're sleeping now until their house gets rebuilt and moved back in. Well, that's not an unreasonable proposition. I'm not going to disagree with the court, but that doesn't apply here, Judge, because, number one, throughout the valley was not the owner. The estate was the owner. They were the beneficiary of the land trust. It could have easily been determined where the land trust was to serve up to Section 24 notice. That wasn't reasonable diligence was not exercised in this case, Judge. And addressing your earlier point, if she knew that each woman was on a job, does that suffice? No. There's a case in Weathers Construction, citing Southern versus Willis, so that doesn't apply. And in cases where the owner has affirmatively established a lack of notice, it is incumbent on the subcontractor to prove actual notice. So that's in the Hillside case, national mortgage versus Hillside. As far as addressing justice rights, the question is whether or not this was an oral contract. It wasn't an oral contract, but it was an oral contract. I mean, I'm worried. Was it time and materials? No, and here's what you have to judge, and it is borne out in the record. There was an extensive written contract that was prepared between, was submitted by Anaconda to LaValle as the executive. And the terms were, almost all the terms were agreed, except for there were variances that LaValle would not agree to, and a contract was never signed by LaValle. But the terms... That's troubling to me. The parties operated in accordance with the terms stated in the agreement. But there was not a written agreement. I appreciate your explanation, but I still find it troubling. If the court would look at the contract, you could see what I'm talking about. It is an extensive contract. I'm not going to look at an unsigned contract. Okay. Your Honor, Judge. Question at please, counsel. Okay. Real quick, distinguishing the Weathertight case, counsel relies on that extensively. Weathertight is completely inapplicable to the NC case. In Weathertight, the owner had actual knowledge that there was a subcontractor on the project, Excel, that had not been paid. Notwithstanding that, the owner still paid the general contractor. That's the whole of the Weathertight. Okay. So you're saying that the Supreme Court said actual knowledge is relevant? Not for any Trinity's claim. Not for services such as 24-4 notice. What I'm talking about in Weathertight is that the owner had knowledge through the general contractor's sworn statement that a subcontractor was owed money. Notwithstanding that knowledge, the owner paid the general contractor all the sums that were due, and the general contractor, that didn't pay the subcontractor. That was the basis of the whole thing. So the actual knowledge has to come through the statement, the contractor's statement? Yeah, the sworn statement. I know what you're saying. We're talking about Conner's claim. Yeah. Okay. That didn't happen here. Okay. Let me be clear so we're going to send out an order, because here's what I'm going to let you know to be fair to you, what I'm thinking. And that is on April, what did I say, 21st? Whatever the check is. You'll see it there. You went in and took a money judgment against Anacom basically for all the I was like, well, rather than fight the liens, I said, okay, I'll just pursue this against Anacom. And rather than wait until after this was all done to wait until this was all done and the liens were all litigated out, you went ahead and took a judgment against Anacom for the full amount. And I haven't caught this yesterday, and quite frankly, I don't know if this is my law school brain tells me from a long time ago that maybe there's a judicial estoppel, maybe there's an election of remedies, maybe there's something, but I'm concerned whether you, now that you've got that judgment in your pocket, whether you can contest those liens, which you represented in the court, or part of that helped make up the amount of that judgment. Well, it was part of the damages that were sustained. There were future damages. At that point, I mean, the liens had been imposed, and the judgment had been entered against LaValle in those amounts. Not only on the mechanics liens, but under Section 28. Well, and like I said, and look at the transcript, too, because I'm concerned with this language. And from you, when you were at the prove-up on that thing, who got a signed affidavit from Joette LaValle, and yada, yada, yada, and then Ms. LaValle spent a total of $558,000 in change. I'll say it again, $558,000. And so I want you to address this and what effect this has on what we're doing here today. And we'll send out a minute order, so you'll have it in writing. You've got 21-21 and 7. Thank you very much. Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible. This court will stand in recess for a final hearing.